Argued March 18; reversed April 14; rehearing denied May 12, 1942

## ALLUM ET AL. *v.* BALL ET AL.

(124 P. (2d) 533)

Before Kelly, Chief Justice, and Bailey, Lusk, Rand, Rossman and Brand, Associate Justices.

*Gordon A. Ramstead* and *S. M. Calkins,* both of Eugene (Calkins & Calkins, Eugene, on the brief), for appellant.

*G. Bernhard Fedde,* of Eugene, for respondents.

KELLY, C. J.  During the time involved herein, defendant, Ball, was operating a lumber mill located about nineteen miles from Drain and a loading dock at Leona which is in near proximity to Drain.  Mr. Ball had a contract with one Parks to haul lumber from the mill to the loading dock using the log truck in suit for which Parks was to receive 50 cents per thousand feet of lumber so hauled, Mr. Ball to furnish said logging truck and defray the expense of its maintenance, namely, gasoline, oil, etc.

Defendant Clement was employed by Parks to load lumber on the truck at the mill and unload it at the dock:

On the day of the accident Parks had gone to Eastern Oregon and defendant Clement drove the truck

loaded with lumber from the mill to the dock. Theretofore Clement had driven the truck upon the premises appurtenant to the mill, but not upon a public highway.

When defendant, Ball, observed Clement operating the truck upon his arrival at the dock, Ball told Clement that he should procure a chauffeur's license, and, in order to subject Clement to an officer's test as to Clement's qualifications for a chauffeur's license, Ball took Clement to Drain in quest of an officer, but they were unable to find one. Mr. Ball then told Clement to take his car and go to Cottage Grove in order to get a chauffeur's license.

When Clement went to Ball's car, he found it locked. Thereupon, assisted by defendant Crandall, Clement disengaged the trailer of the log truck and Clement, accompanied by Crandall, drove off with the front end, that is the cab of the truck, the chassis and the bunk.

When they reached Comstock, Crandall signified a desire to drive the truck and Clement then permitted him to take the steering wheel.

At a distance of four and a half, or five, miles, south of Cottage Grove, Crandall, while driving defendant Ball's log truck, attempted to pass plaintiff's refrigeration or produce truck, and the collision resulted.

It is unnecessary to burden the record with the details of the accident for the reason the question confronting us is whether any liability at all has been shown on defendant Ball's part. The other defendants have not appealed.

Appealing defendant, Ball, assigns error on the part of the trial court in refusing to direct a verdict in his favor.

Plaintiffs claim that the liability of defendant Ball is established by proof of the following facts:

(a) Ball was the owner of the Ford log truck.

(b) Clement was the agent of Ball for the purpose of the trip to Cottage Grove.

(c) When ordered to take the car and get the license, Clement acted reasonably and within the scope of agency in taking the Ford log truck.

(d) Clement was present and in control of the Ford log truck, although a stranger (Crandall) was at the wheel at the time of the collision.

■ When the ownership of an automobile involved in a collision is established, unless the owner presents evidence showing that the driver thereof was not the agent or employee of the owner, and acting within the scope of such agency or employment, such owner is chargeable with the result of the driver's negligence in operating the automobile. *Bunnell v. Parelius*, 166 Or. 174, 111 P. 2d 88; *Lehl v. Hull*, 152 Or. 470, 482, 54 P. 2d 290; *Judson v. Beehive Automobile Service Co.*, 136 Or. 1, 294 P. 588, 297 P. 1050, 74 A. L. R. 944; *Monnet v. Ullman*, 129 Or. 44, 276 P. 244.

■■ As we understand the evidence in the case at bar, there is no evidence that defendant Clement was either the employee or agent of defendant Ball in operating Ball's truck.

Ball had given his permission to Clement to use his Chevrolet coupe to go to Cottage Grove for the purpose of securing a chauffeur's license. Nowhere in the record does it appear that permission was granted to Clement to use the log truck for that purpose. Both Clement and Ball testify that such permission referred to the Chevrolet coupe. The truck was taken by Clement upon his own initiative because the coupe was locked and Clement preferred to take

the truck rather than to ascertain where the key to the coupe could be had and then procure it.

Clement was an employee of Parks but not of defendant Ball.

■ It is argued that because the possession of a chauffeur's license by Clement would have been beneficial to Ball, it could be reasonably deduced that Ball had given Clement permission to use the truck in procuring such license. We think that no such inference results in the light of the express permission by Ball that Clement could use Ball's Chevrolet coupe in procuring the license.

■ We cannot agree with plaintiffs that Clement acted reasonably in taking the truck when the only express permission granted him referred to the coupe.

While the record indicates that because Clement had no chauffeur's license, Ball objected to the use of his truck by Clement, an employee of Parks, to transport lumber from the mill to the dock, it does not disclose that Clement was an employee of Ball or subject to his orders. At most, it shows that Ball was willing to permit Clement to use the Chevrolet coupe in going to Cottage Grove to secure a license. Clement did not act upon that permission, or upon any permission by Ball when he took Ball's truck instead of Ball's coupe.

Referring to the permission given him by Mr. Ball to take the Chevrolet car, Clement testified as follows:

"Q. What took place, Mr. Clement? Will you tell me what occurred at that time?

"A. Well, when I got there to the dock I unloaded it and Sam Ball got kind of huffy because I brought the load in without a chauffeur's license, and he wanted me to go to Cottage Grove and get a chauffeur's license, wanted me to take his car, 1938 Chevrolet. He headed some place down to Drain to do something,

and I went over to the car to take it and there wasn't any keys in it, and so I decided to take the truck on my own."

And later Mr. Clement was asked:

"Q. And you did not have authority from Mr. Ball to take the truck?"

To which he answered: "No, I did not."

With respect to the same conversation, Mr. Ball testified as follows:

"Q. After that load had been brought from the mill to the loading dock will you tell the jury just what happened there after he got there?

A. Well, after he got there I seen Arlie was driving the truck and I jumped him about his chauffeur's license. I always try to be particular to see my driver has the proper license, and I hauled him down to Drain to look for a cop to take the chauffeur's license test, and I couldn't, and I sent him to Cottage Grove with my own car to get his license. And then I went on down to Drain with John Snyder to bill out a car. When I got back—I wasn't there long, and I noticed the car was there and the truck was gone, and I didn't know where they went, whether they just drove off the truck and parked it or what. In a little while Mr. Clement came back and told me about the wreck and I got in my car then and went up to the wreck.

Q. At the time you went with Mr. Snyder up to Drain with the bill of lading what did you say to Mr. Clement about the use of this car?

A. I told him to take my car and go in and get his license.

Q. And by 'your car' will you state what you designated as your car at that time?

A. The 1938 Chevrolet."

Mr. Ball further testified as follows:

"Q. Was it" (referring to the Chevrolet) "on the loading dock at the time?

A. Oh, yes.

Q. And do you recall where the keys to the Chevrolet were at the time?

A. In my pocket.

Q. You had forgotten to leave them in the car?

A. Just force of habit. I always take the keys out.

Q. Had you at any time prior to this date given Mr. Clement authority to drive this truck?

A. No.

Q. Had he ever driven your Chevrolet car before?

A. Yes.

Q. He had never driven your truck before?

A. Never had driven a truck.

Q. Had you at any time ever given Mr. Clement, Arley Clement, authority to drive your truck?

A. No.''

On cross-examination, Mr. Ball's attention was called to the fact, a very evident fact, that on the day in question Clement had driven the truck from the mill to the loading dock and hence, Mr. Ball's statement, that Clement had not driven the truck before permission to use the Chevrolet was given, was inaccurate.

■ It is obvious that the trip from the mill to the loading dock was the casus belli evoking Mr. Ball's huffiness toward Clement and impelling the permission to Clement to use the Chevrolet as stated. It was an event which Mr. Ball would not intentionally conceal, but one comprising a material phase of his defense, namely, his objection to the operation of the truck by Clement.

This objection rested not only upon Clement's inexperience as a truck driver but also on the fact that operating the truck entailed more expense than driving the coupe.

The judgment of the circuit court against defendant, S. R. Ball, is reversed and this cause is remanded with instructions that an order of dismissal as to said defendant, S. R. Ball, be entered.